UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
:
WELLS FARGO BANK, NATIONAL :
ASSOCIATION, as Trustee, : **AMENDED FINDINGS OF FACT**
: **AND CONCLUSIONS OF LAW**
Plaintiff, : **GRANTING SUMMARY**
: **JUDGMENT TO PACIFIC**
-against- : **INVESTMENT MANAGEMENT**
: **COMPANY LLC, AND RELATED**
MARGATE FUNDING I, LTD., MARGATE : **RELIEF**
FUNDING I, CORP., MACQUARIE :
INVESTMENT MANAGEMENT ADVISERS, : 21 Civ. 4939 (AKH)
ANGELO GORDON MANAGEMENT, LLC, :
BRACEBRIDGE CAPITAL, LLC, SERENGETI :
ASSET MANAGEMENT, LP, CITIBANK, N.A., :
CEDE & CO., JOHN DOES 1-100, BOFA :
SECURITIES, INC, PACIFIC INVESTMENT :
MANAGEMENT COMPANY LLC, :
:
Defendants. :
:
------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

  Wells Fargo Bank, National Association ("Wells Fargo"), the Trustee of a securitization trust called Margate Funding I, Ltd. ("Margate"), filed an interpleader complaint in June 2021, seeking adjudication of the respective rights of the interpleader defendants to disputed trust funds. *See* ECF No. 20. The court has jurisdiction of the subject matter and the parties. *See* ECF No. 76 (Crotty, J.). Wells Fargo has been discharged of liability, *see id.*, and holds the interpleader funds of $20,845,308.35 in an interest-bearing account, subject to further order of this court, and for the benefit of the parties entitled thereto.

  Of the parties identified in the caption, only three remain with affirmative claims to the *res*: Angelo Gordon Management, LLC, Bracebridge Capital, LLC, and Pacific Investment Management Company LLC ("PIMCO"). PIMCO is adverse to Angelo Gordon Management,

1

LLC and Bracebridge Capital, LLC. All other parties have been discharged. *See* ECF Nos. 76, 111, 148, and 156. PIMCO, and Angelo Gordon Management, LLC and Bracebridge Capital, LLC, filed cross-motions for summary judgment.

With the assent of the parties, and since there were no issues of credibility, I converted the proceeding into a Rule 52 hearing. *See Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142 (2d Cir. 1998). After hearing oral arguments on January 22, 2025, and subject to the amended findings of fact and conclusions of law I now issue, I granted PIMCO (hereinafter, the "Senior Note-Holders")'s motion for summary judgment, and denied the cross-motion of Angelo Gordon Management, LLC and Bracebridge Capital, LLC (hereinafter, the "Junior Note-Holders"). However, after further briefing from the parties and further consideration, the relief granted to PIMCO should be adjusted downward in order to reflect an overpayment of interest, as described in paragraph 27, below.

## I.    Findings of Fact

1. In 2004, the Margate trust was created under a trust Indenture to hold a pool of residential mortgage-backed securities, for investments by accredited institutional investors.

2. Credit rating agencies, such as S&P and Moody's, rate the relative creditworthiness of such residential mortgage-backed securities on a scale from best-performing to worst-performing, giving letter designations such as 'AAA' or 'C.' The health of securities is also measured by credit spreads, or the difference between the yields of two equally mature securities with different credit ratings.

3. To raise money from institutional investors to purchase those assets, Margate issued debt in the form of Notes structured into senior and junior classes. Margate's Offering Memorandum represented, as a condition of the sales of the Notes, that each class of Notes had not less than a certain level of credit rating—in the case of PIMCO's Notes, not lower than "Aaa" for a Moody's rating, and not lower than "AAA" for an S&P rating and, for the Junior Note Holders, not lower than "Aaa2," "Aa2," "AAA," or "AA," depending on the sub-class of the Junior Notes. ECF No. 128-2, at p. 13.

4. PIMCO is the real party in interest to assert the interests of the Senior Note-Holders.

5. Angelo Gordon Management, LLC and Bracebridge Capital, LLC are the real parties in interest to assert the claims of the Junior Note-Holders.

6. The trust Indenture provided for quarterly distributions of income from the mortgages, on March 4, June 4, September 4 and December 4, under a payment "waterfall" provision. ECF No. 128-1, at p. 47. In terms of priority, and as defined by the Indenture, income was distributed first to pay interest due to the Senior Note-Holders, then to pay interest to the Junior Note-Holders, then to reduce the principal of the Senior debt, and then to reduce the principal of the Junior debt. Trust Indenture, § 11.1, ECF No. 128-1. The Trust Indenture provided also for distributing any excess funds to another class of Note-Holder, not relevant to this case.

7. The interest rate for the Senior Notes held by PIMCO was set at LIBOR plus 33 basis points. The interest rate for the Junior Notes was set at LIBOR plus

3

either 60 or 80 basis points, depending on the subclass of the Junior Notes. LIBOR, during the time of its operation, was the London Interbank Offered [Interest] Rate and was set daily.

8. Pursuant to the trust Indenture and Collateral Management Agreement, Margate retained a Collateral Manager, Macquarie Investment Management Advisers, to manage the portfolio of assets in the Margate trust. *See* Management Agreement, ECF No. 128-3. No party asserted a claim against Macquarie, and Macquarie asserted no claim against any other party. By consent, and pursuant to its motion for judgment on the pleadings, Macquarie was dismissed and dropped as a party. *See* ECF No. 148.

9. Pursuant to the trust Indenture, the Collateral Manager was required to classify non-performing and poorly performing securities, reflected by the downgrading of their credit ratings, as Credit Risk, and Defaulted, Securities, and consider their sale.

  a. The Indenture defined Credit Risk Security as "any Collateral Debt Security included in the Collateral [for which] . . . (b) during a Restricted Trading Period, such Collateral Debt Security has been downgraded or put on a watch list for possible downgrade by one or more Rating Agencies or Fitch by one or more rating subcategories since it was acquired by the Issuer or (c) since the date on which the Collateral Debt Security was purchased by the Issuer, there has been an increase in credit spread . . . of (i) 0.20% or more in the event that the original credit spread was 0.50% or more, or (ii) 0.10% or more in

the event that the original credit spread was less than 0.50%." ECF No. 128-1, at p. 18.

b. The Indenture defined Defaulted Security as "any Collateral Debt Security or any other security included in the collateral . . . that, (a) (1) is rated "Ca" or "C" by Moody's, (2) is rated "Caa2" or "Caa3" by Moody's and is on watch for downgrade or (3) has no rating from Moody's but has obtained a credit estimate from Moody's that such Collateral Dent Security has a Moody's rating factor of 10,000, or (b) (1) if such security is an Asset-Backed Security or a Synthetic Security, the Reference Obligations of which are Asset-Backed Securities, is rated "CC," "C," "D" or "SD" by Standard & Poor's, and (2) if such security is other than an Asset-Backed Security or a Synthetic Security, the Reference Obligations of which are Asset-Backed Securities, the issuer credit rating is rated "D" or "SD" by Standard & Poor's." Trust Indenture at 19-20, ECF No. 128-1.

10. Under the Indenture, the Collateral Manager was required to cause Defaulted Securities to be sold within a two-year period (in certain circumstances, three years) and, as to Credit Risk Securities, at his discretion. Trust Indenture, §§ 12.1(b)(i), 12.1(a)(i), 12.1(a)(iii), ECF No. 128-1.

11. In causing securities to be sold, the Collateral Manager was required to act in a "commercially reasonable" manner, and to certify to the Trustee at least two business days in advance of the settlement date that the conditions for a sale were met and to specify whether each security for sale was a Defaulted

Security or a Credit Risk Security. Trust Indenture, §§ 10.9, 12.1, ECF No. 128-1.

12. Proceeds from any sale of Defaulted or Credit Risk Securities were to be distributed according to the Indenture's "waterfall" provision. Trust Indenture, § 11.1(ii), ECF 128-1.

13. At various dates within the twenty-four-month period prior to March 18, 2021, the Collateral Manager determined that nine securities in the Margate portfolio were Defaulted Securities.

14. On March 18, 2021, the Collateral Manager held a bid-wanted-in-competition intraday auction for the sale of those nine residential mortgage-backed securities. The Collateral Manager notified potential bidders of the auction around 10:30 a.m. on March 18, 2021, with all bids required to be submitted by 5:00 p.m. that same day. The sales of all nine securities were executed by 6:07 p.m. on March 18, 2021. The Collateral Manager notified more than thirty potential bidders of the auction, and twelve participants submitted at least thirty-five bids.

15. The Collateral Manager delivered the requisite certifications of the sales on Friday, March 19, 2021, classifying all nine securities as Defaulted Securities. The settlement date for the sale of the nine securities was Monday, March 22, 2021.

16. Five of those nine securities satisfied the definition of Defaulted Securities under the Indenture, their S&P credit ratings in the twenty-four month period prior to March 18, 2021 having fallen to 'D' or 'CC' from an initial rating of

'AAA', 'AA+,' or 'AA-.' *See* Rule 56.1 Statement ¶¶ 29-33, ECF No. 121. As Defaulted Securities, sale within a two-year period by the Collateral Manager was required. Trust Indenture, § 12.1, ECF No. 128-1. The proceeds of the sales of the five securities on March 18, 2021 was approximately $11.1 million.

17. Following challenge on April 26, 2021 by Junior Note-Holders (a month after the sale) that four of the nine securities should not have been classified as Defaulted Securities and should not have been sold, e-mail from Marc Lessner to Jason Corn (April 26, 2021, 09:26 EST), ECF No. 128-25, the Collateral Manager, on May 3, 2021, acknowledged that the failures of the securities' ability to pay interest when due were not sufficient reason by themselves to classify the securities as Defaulted, but that since they had been sold, the sales "could not be unwound." E-mail from Karin Kelly to Marc Lessner (May 3, 2021, 18:09 EST), ECF No. 128-25. The Collateral Manager further stated that he then had determined to sell the securities "due to the impending cessation of LIBOR and the desire to avoid any resulting adverse impacts on the market values of these securities." *Id.*

    a. LIBOR was expected, by June 2023, to cease to be published as an interbank interest rate, thereby eliminating the benchmark provided in the trust Indenture for quarterly distributions to Senior and Junior Note-Holders.

    b. Although alternatives to LIBOR were being discussed, and although the New York Legislature was proposing a Secured Overnight

7

Financing Rate that might be available to replace LIBOR as a benchmark, *see* ECF No. 128-17, Finkel Report, ¶¶ 62-62, the Collateral Manager had proper discretion to opt for a current sale, rather than assume added market risk in relation to an already distressed security.

18. The four securities had been distressed for some time, *see* Wahaidi Dep. at 102, ECF No. 128-17, causing an increase in "credit spread" of more than 0.20% to make the securities Credit Risk Securities. *See* Rule 56.1 Statement ¶¶ 36-39, ECF No. 121; Trust Indenture at 18, ECF No. 128-1. As Credit Risk Securities, the Collateral Manager was authorized to sell them at any time, in its discretion. Trust Indenture, § 12.1, ECF No. 128-1. Although the four securities were sold as Defaulted Securities, the Collateral Manager could as easily have sold them as Credit Risk Securities, for "all Defaulted Securities also qualify as Credit Risk Securities," the creditworthiness of these securities had "significantly deteriorated since they were acquired," and it was better for the portfolio that they be sold. *See* ECF No. 157 at p. 3-4 (quoting Wahaidi Dep., ECF No. 128-18).

19. Of the four securities, three were classifiable as Defaulted Securities, not only because of failures to pay interest, but also because their credit ratings had fallen to a Moody's 'C' or an S&P 'D.' *See* Rule 56.1 Statement ¶¶ 41-45, ECF No. 121. As Defaulted Securities, their sale was required. *See* Trust Indenture, § 12.1, ECF No. 128-1. The sale of the fourth security, a Credit Risk Security, which yielded $565,000, was discretionary.

20. The Junior Note-Holders agree that the four securities "had met the objective criteria for a Credit Risk Security," but argue that the securities really were not distressed because they had had a stable price for three-and-a-half years. ECF No. 152 at p. 2. The Junior Note-Holders agree that the Collateral Manager had been trying for some time to sell the distressed securities, but had desisted to do so because of objections by the Junior Note-Holders. *See* ECF Nos. 128-26, 128-27, and 128-28.

21. I find that the Collateral Manager was authorized by the Trust Indenture to sell the nine securities, that he exercised discretion in doing so, and that his exercise of discretion was commercially reasonable. All nine securities were distressed; they satisfied the criteria of the Trust Indenture for enabling or requiring sale, as either Credit Risk or Defaulted Securities; and the Collateral Manager had desired to sell them for some time to avoid further weakening of the portfolio. The Collateral Manager's concern about the uncertainty that might result from the impeding cessation of LIBOR added to the commercial reasonableness of his decision to sell.

22. I further find that the sale of all nine securities at an intraday auction, as conducted by the Collateral Manager, was commercially reasonable. That he received thirty-five bids from twelve different bidders, and that he received commercially reasonable prices, above par, support that finding. *See* Freed Rebuttal Report at ¶ 11, ECF 128-16. The argument by the Junior Note-Holders that a longer period would have resulted in better prices is

speculative. *See* Finkel Report at ¶ 73, ECF 128-17. Any better prices would have benefited the Senior, and not the Junior, Note-Holders.

23. The sales of the nine securities generated $20,845,308.35 in proceeds, which sum is in escrow. PIMCO is entitled to that amount.

24. In my discretion I may award pre-judgment interest. *See* NY CPLR § 5001(a); *see also Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 684 (2d Cir. 1989). Interest is appropriate here because PIMCO has been deprived of the use of its funds; however, the New York State interest rate of nine percent would be excessive in this context. PIMCO is therefore entitled to five percent interest on the $20,845,308.35 held in escrow. Such amount in interest is appropriate considering the rate of interest due on the Senior Notes.[1]

25. Pursuant to the Indenture, since the quarterly interest was paid in full to both the Senior and the Junior Note-Holders, the entirety of the sales proceeds should have been applied to pay down the outstanding principal debt of the Senior Notes. *See* Trust Indenture, § 11.1, ECF 128-1. However, because of the protest of the Junior Noteholders in May 2021, challenging the sales of all nine securities as unauthorized or improper under the Indenture, the Trustee held the proceeds in escrow and continued to pay quarterly interest to Senior and to Junior Note-holders under the Indenture's "waterfall" provision.

---

[1] While LIBOR was still in effect, such interest rate averaged just under 3% (LIBOR plus .66%). Following the cessation of LIBOR, the interest rate was calculated according to the mean of the Prime Rate as published by JPMorgan Bank, N.A., and ranged from about 3.85% to about 9% (the Prime Rate plus .66%). *See* Letter from Junior Note-Holders in Response to the Court's Order Regulating Judgment Procedures (March 14, 2025), ECF No. 164.

26. The total outstanding principal debt of the Senior Notes as of the date of sale of the nine securities was approximately $143 million. *See* Rule 56.1 Statement ¶ 26, ECF No. 121. Had the sales proceeds been used to pay down the outstanding principal debt of the Senior Notes, there would have remained approximately $122 million in outstanding principal debt of the Senior Note.

27. The Collateral Manager continued to pay interest to PIMCO through December 31, 2022 without accounting for the reduced principal balance.

    a. In September 2021, PIMCO was over-paid interest in the amount of $25,524. *See* Freed Reply Decl., Fig. 1, ECF No. 138. In December 2021, PIMCO was over-paid interest in the amount of $23,245. *See id.* In March 2022, PIMCO was over-paid interest in the amount of $26,055. *See id.* In June 2022, PIMCO was over-paid interest in the amount of $46,548. *See id.* In September 2022, PIMCO was over-paid interest in the amount of $103,986. *See id.* In December 2022, PIMCO was over-paid interest in the amount of $183,744. *See id.* The total amount of over-payments of interest to PIMCO was $409,102.

    b. For the first five of those six quarters, through September 30, 2022, the Junior Note-Holders were paid the full amount of the interest payments owed to them under the Trust Indenture. Any excess amount, once interest was paid to the Junior Note-Holders, would have gone to the Senior Note-Holders to reduce the principal debt. Trust Indenture, § 11.1, ECF No. 128-1. Thus, the amount that PIMCO was

11

over-paid in interest for those five quarters, $225,358, was due to PIMCO in the form of principal repayment, and PIMCO is properly entitled to that amount.

c. For the quarter ending December 31, 2022, the Junior Note-Holders experienced an interest payment shortfall in the amount of $183,744. *See* Freed Reply Decl., Fig. 1, ECF No. 138.

d. The net balance overpaid to the Senior Note-Holders was $183,744.

28. In subsequent quarters, there were insufficient funds to pay interest in full even to the Senior Note-Holders. *See* Rule 56.1 Statement ¶ 62, ECF No. 121.

29. The latest reported amount of interest accumulated in the escrow was $2,393,445.65, which was calculated as of December 4, 2024. *See* PIMCO's Proposed Computations for Judgment at 1, ECF No. 159.

30. The following computation must be made to adjust and appropriate charge to PIMCO'S entitlement to the escrow:

a. The escrow amount, $20,845,308.35, plus interest at five percent from June 4, 2021 through April 8, 2025, less interest accumulated in the escrow in the amount of $2,393,445.65; less:

b. The overpayment outlined in paragraph 27(d) above, in the amount of $183,744, with interest at five percent from the date of the overpayment, December 5, 2022, through April 8, 2025.

## II.   Conclusions of Law

1. The sale of all nine securities was authorized by the Trust Indenture.

2. The Collateral Manager caused the nine securities to be sold in a commercially reasonable manner.

3. PIMCO shall recover the funds in escrow, as described in paragraph 30 above, and have judgment for costs as taxed by the Clerk. The Clerk shall terminate all open matters.

SO ORDERED.

Dated: April 8, 2025
New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge